**In re Robert William NITTLER, Debtor.**

**Civ. A. No. 86–4094–S.**

United States District Court,
D. Kansas.

Sept. 23, 1986.

S. Richard Mellinger, Roach & Mellinger, Emporia, Kan., for plaintiff.

Lloyd C. Swartz, Topeka, Kan., Trustee.

Max M. Hinkle, Lehman, Guilfoyle & Hinkle, Abilene, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on an appeal by the First National Bank of Herington (appellant) from a decision of the United States Bankruptcy Court for the District of Kansas, confirming a Chapter 13 Plan submitted by Robert Nittler (appellee). The appellant argues that the bankruptcy court erred in its finding that the plan was submitted in good faith, a requirement under 11 U.S.C. § 1325(a)(3).

Under 28 U.S.C. § 158(a), district courts of the United States have jurisdiction to hear appeals from final orders of bankruptcy judges entered in cases under section 157 of Title 28 of the U.S. Code. Confirmation of a bankruptcy plan is a final order, and is expressly included as a core proceeding under 28 U.S.C. § 157(b)(2)(L). An appeal from an order rendered in a core proceeding is governed in the same manner as appeals in civil proceedings taken to the courts of appeals from the district courts. 28 U.S.C. § 157(c). The standard of review in an appeal from the bankruptcy court is as follows:

> On an appeal, the district court or a bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Bankruptcy Rule 8013. *See In re Reid,* 757 F.2d 230, 233–34 (10th Cir.1985). "When reviewing factual findings, an appellate court is not to weigh the evidence or reverse the finding because it would have decided the case differently.... A trial court's findings may not be reversed if its perception of the evidence is logical or reasonable in light of the record." *In re Branding Iron Motel, Inc.,* 798 F.2d 396 (10th Cir.1986). The clearly erroneous standard does not apply to the bankruptcy court's conclusions of law. "It is appropriate for the district court to review *de novo* the bankruptcy court's legal determinations." *Id.*

## I. BANKRUPTCY COURT'S FINDINGS

Pursuant to the preceding authority, the following findings of fact are not clearly erroneous and will be considered by this court as true:

1. Robert W. Nittler (the debtor) was employed by the Tri-County Feedlot Co. in Herington, Kansas from 1980 to 1984, first as bookkeeper and later as manager. He

owned 10% of the stock in the company. The debtor started his own cattle feeding operation in 1978, and he also had a 240 acre farm. The plaintiff Bank financed both the feedlot company and the debtor's own cattle feeding operation.

2. The feedlot company began suffering financial losses in 1980. To keep the company going, the debtor and other shareholders began feeding their own cattle at the company feedlot. As a result, the debtor suffered substantial losses in his own cattle feeding operation.

3. In April 1984, to obtain a $48,718.43 loan from the Bank, the debtor represented 134 head of a feedlot customer's cattle as his own. He also sold cattle in which the Bank had a security interest.

4. In September, 1984, the debtor left his family and job at the feedlot, and dropped out of sight for six weeks. He left unannounced and did not even tell his wife he was leaving. At trial, he stated: "I knew I was going to have an overdraft at the Bank on the feedlot. And the money that I needed which I had to talk to people about was not there, and the pressure got to me." Upon his return, the debtor sought therapy at the Mental Health Center of Central Kansas.

5. The debtor attempted to work out a settlement of his debts with the Bank, but the parties did not reach an agreement. The debtor filed a Chapter 13 petition on December 5, 1984.

6. The petition listed $93,540.64 of unsecured debt and $83,591.25 of secured debt. The amount of unsecured debt was close to the $100,000 maximum allowed under Chapter 13. *See* 11 U.S.C. § 109(e). On December 4, the debtor had converted $14,100 of unsecured debt to the Bank into secured debt by borrowing that sum from his in-laws, signing a mortgage in their favor, and depositing the money in his account at the Bank. The Bank also had a security interest in the debtor's feedlot stock. The debtor valued the stock at $5,000 in his schedules, but later admitted it was worthless.

7. The Bank will receive little or nothing under the debtor's plan. According to the debtor's amended budget worksheets, his monthly income is approximately $1,615. His wife's income is $744 per month, for a total monthly household income of $2,359 per month.

8. Household expenses are $1,214 per month. The debtor's employment requires him to maintain a separate residence. Expenses from the apartment, travel to and from his home, and the like, are $497 per month. Total monthly expenses are $1,711. The debtor proposes to pay the trustee $300 a month for 36 months, and his wife will also pay $300 a month to secured creditors. This leaves a surplus of $48 per month. Of the $10,800 to be paid under the plan, unsecured creditors will receive only $89.66.

The appellant argues that other facts exist which prove the bad faith of the appellee, and that the bankruptcy court failed to properly consider these in its order confirming the plan. For instance, the appellant claims that on the day before the bankruptcy petition was filed, the appellee obtained a $14,000 loan from his in-laws, the proceeds of which were applied to one of appellant's claims against the appellee. The particular debt to which this money was applied was a fraudulently induced loan, which would be non-dischargeable in Chapter 7 bankruptcy. The $14,000 payment ostensibly brought the total amount of unsecured debt below $100,000, which allowed the appellee to fulfill the requirements for filing bankruptcy under Chapter 13 and to avoid the harsher provisions under Chapter 7. Appellant's claim, which is unsecured because of appellee's false statement of collateral, is dischargeable under Chapter 13. The appellant raises other arguments based on inaccuracies in the appellee's proposed plan, all of which tend to weigh on the issue of good faith.

■ To the extent of the bankruptcy court's enumerated facts, none are clearly erroneous. However, the court had before it the issue of good faith, which requires an inquiry into a broad range of pre- and

post-filing conduct of the debtor. This court holds that the scope of the bankruptcy court's inquiry was not sufficient for it to make a proper determination of whether the plan was proposed in good faith. Its failure to do this was clearly erroneous. Thus, while the bankruptcy court's finding of fact contained no clearly erroneous statement per se, the record indicates additional facts that the court should have found and considered had it placed sufficient emphasis on the appellee's pre-filing conduct in determining the presence of bad faith. The necessity of inquiring into such conduct is demonstrated by legislative history and case law.

## II. RELEVANT LAW CONCERNING GOOD FAITH AND APPLICATION TO THIS CASE

■ The Bankruptcy Code provides that the bankruptcy court shall confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). "The good faith requirement is neither defined in the Bankruptcy Code nor discussed in the legislative history. The phrase should, therefore, be interpreted in light of the structure and general purpose of Chapter 13." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431–32 (6th Cir.1982). This court finds helpful the discussion of the legislative history of Chapter 13 set forth in *In re Yavarkovsky*, 23 B.R. 756 (S.D.N.Y.1982). In *Yavarkovsky*, the court noted:

> The purpose of Chapter 13 is "to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement."

*Id.* at 758 (quoting House Report No. 95–595, 95th Cong., 2d Sess. 118, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6079). Congress perceived the benefits of a Chapter 13 Plan to be as follows:

> Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition, it satisfies many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident; their losses will be significantly less than if their debtors opt for straight bankruptcy.

*Id.* The *Yavarkovsky* court concluded that because of the tremendous advantage of a Chapter 13 bankruptcy, the good faith requirement "contemplates a *broad judicial inquiry* into the conduct and state of mind of a debtor, with reference to the proposal of the plan." 23 B.R. at 759 (emphasis added).

The Tenth Circuit has also addressed the issue of good faith in proposing a Chapter 13 bankruptcy plan. In *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983), the court adopted an approach in which no single factor is crucial enough to result in a per se finding that the proposed bankruptcy plan was made in bad faith. The court stated that the principal issue is "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Id.* at 1347 (quoting *In re Estus*, 695 F.2d 311, 316 (8th Cir.1982)). The *Flygare* court enumerated eleven separate factors relevant to a determination of good faith. The court stated, however, that the list is not exhaustive, and that the weight given each factor will necessarily vary with the facts and circumstances of each case. 709 F.2d at 1347–48. The court also gave no indication as to how many factors must be present in order to find bad faith. Thus, the inquiry is necessarily somewhat subjective. Although it is not necessary to reproduce here the Tenth Circuit's entire list of factors, the appellant has chosen three of these factors as relevant to its appeal. These are as follows:

(A) The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured

debt and whether any inaccuracies are an attempt to mislead the court.

(B) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7.

(C) The motivation and sincerity of the debtor in seeking Chapter 13 relief.

This court finds that sufficient evidence was presented to the bankruptcy court on these three factors to warrant a much broader inquiry into good faith. Because of the broad judicial inquiry necessary to establish the good faith of the debtor-in-bankruptcy, especially in light of the generality and wide scope of the *Flygare* test, the bankruptcy court should have made additional findings of fact. In particular, omission of the following facts was clearly erroneous:

(1) Robert Nittler knowingly misrepresented to the First National Bank of Herington that he owned the particular 134 heifers listed as collateral on a note dated April 18, 1984 (partial transcript of hearing on objection to confirmation, at 19–20).

(2) During an on-site inspection by bank officials, Nittler knowingly and falsely identified 134 heifers as being owned by him. During that inspection, Nittler knowingly produced false records that tended to show his ownership of the 134 heifers (partial transcript, at 20–21).

(3) Although the information provided by the appellee in documents filed with the bankruptcy court was inconsistent as to the precise value of his real property, at the time Nittler borrowed $14,000 from his in-laws and gave them a $16,000 mortgage on his land in return, his 160–acre tract was already burdened with at least two mortgages and the 80–acre tract had at least three. The total of these prior mortgages was $81,991.25, consisting of the following:

| | |
|---|---|
| Blythe Estate | $ 7,865.25 |
| Farmers Home Administration | 44,551,00 |
| Mellinger & Roach Law Firm | 10,000.00 |
| Venberg Estate | 19,575.00 |

Adding the in-laws' mortgage makes a total of $97,991.25

In addition, as will be demonstrated below, the bankruptcy court's failure to determine (a) the fair market value of appellee's real property at the time of filing the petition; (b) the surplus, if any, of the amount appellee owed in mortgaged debt over the fair market value of the property; and (c) the total amount of unsecured debt in light of the possible surplus of mortgaged debt in (b) and the worthlessness of the Tri-County Feed Lot, Inc. stock, contributes to this court's holding that the findings of fact were clearly erroneous. In order to aid the bankruptcy court on remand, it will be helpful to outline the relevant law relating to the appellant's claims.

## A. PRE–FILING CONDUCT

The court will first address *Flygare* factors (B) and (C) listed above, which collectively scrutinize the pre-filing conduct of the debtor and whether that conduct indicates bad faith. The bankruptcy court gave short shrift to the events occurring prior to the appellee's filing of Chapter 13 bankruptcy. In a recent Fourth Circuit opinion, that Court stated that "[u]nless ... pre-petition misconduct may be factored into the § 1325(a)(3) good faith equation, affected creditors, who might indeed fare substantially better under Chapter 7, with its stricter discharge provisions, would be unable effectively to challenge an offending plan." *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir.1986). "Where significant claims involve conduct that would otherwise raise serious Chapter 7 dischargeability issues ... the quality of that conduct is part of the 'totality of the circumstances' which must be weighed, with other factors, in assessing the debtor's good faith under Chapter 13." *Id.*

Similarly, in *In re Yavarkovsky*, 23 B.R. 756 (S.D.N.Y.1982), the district court vacated the bankruptcy court's confirmation of a Chapter 13 plan because of pre-petition conduct indicating connivance, contrivance, and conduct inconsistent with good faith. The court stated that the good-faith requirement "goes much farther than whether there has been technical compliance with

statutory obligations.... Such inquiry properly enters into all aspects of fair dealing relevant to the proposal of the plan." *Id.* at 759. The court particularly noted, as part of the bad faith conduct, the debtor's non-arm's-length sale of assets, which was detrimental to creditors. This conduct is not dissimilar to appellee's apparent non-arm's-length loan from his in-laws, the ultimate effect of which may be to discharge nearly $100,000 of otherwise non-dischargeable debt. The *Yavarkovsky* court also questioned a sale of stock to the debtor's mother in an apparent attempt to convert as much as possible of the value of the asset into exempt form, to the prejudice of the creditors. *Id.* Thus, it is proper for the court to *scrutinize* the motive behind, and actual effect of, *each transaction* by the debtor that might alter both the bankruptcy chapter available to the debtor and the repayment of debts to creditors upon completion of the bankruptcy proceeding.

Finally, the court in *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 432 (6th Cir.1982), stated the following in relation to the relevancy of pre-petition conduct in determining the good faith of a proposed bankruptcy plan:

> Obviously, the liberal provisions of the new Chapter 13 are subject to abuse, and courts must look closely at the debtor's conduct before confirming a plan. We should not allow a debtor to obtain money, services or products from a seller by larceny, fraud, or other forms of dishonesty and then keep his gain by filing a Chapter 13 petition within a few days of the wrong. To allow the debtor to profit from his own wrong in this way, through the Chapter 13 process, runs a risk of turning otherwise honest consumers and shopkeepers into knaves. The view that the bankruptcy court should not consider the debtor's pre-plan conduct in incurring the debt appears to give too narrow an interpretation to the good-faith requirement.

This court finds that closely scrutinizing the debtor's pre-petition conduct is grounded in the strong public policy against manipulation of the bankruptcy statutes by debtors who procure obligations through fraudulent misrepresentations and then seek refuge under Chapter 13 in order to render the fraudulent liabilities dischargeable. However, the court is mindful that "a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good-faith effort by the debtor to satisfy his creditor's claims." *Neufeld,* 794 F.2d at 153.

■ In reviewing this debtor's pre-filing conduct, the court first notes that the appellee's fraudulent representation of collateral in procuring the loan from appellant would render the loan non-dischargeable in a Chapter 7 bankruptcy. *See* 11 U.S.C. § 523(a)(2):

> § 523. Exceptions to discharge.
>
> (a) A discharge under [Chapter 7] does not discharge an individual debtor from any debt—
>
> ....
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition
>
> (iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.

The bankruptcy court agrees on this point. This fact alone supports the absence of good faith under the *Flygare* test. *See Flygare,* 709 F.2d at 1347 (factor number 7).

■ A second area of analysis concerns the figures representing the numerous mortgages and the value of the underlying

property securing the indebtedness, which raise a serious question as to the value of the mortgage given to the appellee's in-laws. If the in-laws effectively received no collateral for the loan, the court must consider whether the mortgage was a subterfuge for a bad-faith attempt to convert just enough unsecured debt into secured debt in order to permit a Chapter 13 filing. Thus, bringing the amount of unsecured debt below $100,000 would avoid the Chapter 7 non-dischargeability of the fraudulently incurred debt procured from the appellant, by permitting the debtor to file under Chapter 13. Although the bankruptcy court correctly noted that a plan which proposes to do what the statutes permit cannot be in bad faith *solely* for that reason, the bankruptcy court should view this conduct in light of the following:

> Resort to the more liberal discharge provisions of Chapter 13, *though lawful in itself,* may well signal an "abuse of the provisions, purpose, or spirit" of the Act, especially where a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct and the debtor proposed only minimal repayment of these claims under the plan.

*Neufeld,* 794 F.2d at 153 (emphasis added). Therefore, this is a second factor that weighs against a finding of good faith.

The bankruptcy court also failed to make a factual finding on the actual value of the mortgaged real estate. Such a finding is crucial to determining the amount of actual unsecured debt and consequently whether the circumstances surrounding the loan from the appellee's in-laws affect his good faith. This court notes other cases in which property and mortgages or liens against property were valued in order to determine how much of the debt was unsecured. In *In re Norman,* 32 B.R. 562 (Bankr.W.D.Mo.1983), the debtor owned property valued at $45,000. One secured creditor was able to foreclose on the property in the amount of $25,500. The debtor then had $20,500 worth of equity in the property. Under 11 U.S.C. § 522(d)(1), the debtor was allowed an exemption of $7,500

on this property, thus leaving $13,000 worth of equity available to other creditors. The debtor's former wife was a judgment creditor in the amount of $91,000. The court noted that in Missouri, a judgment creditor holds an automatic lien upon real estate of the person against whom the judgment is rendered. Accordingly, the court held that $13,000 of the judgment creditor's claim was to be treated as a secured debt. The remaining $78,000 was unsecured, and when combined with $19,-000 worth of unsecured debt in the case, the debtor's total unsecured debt was $97,-000, just under the Chapter 13 limit. Thus, even though the judgment creditor had a lien upon all the real property of the debtor, the court held that the judgment creditor's lien was secured only to the extent of the value of the available property. The court made an actual determination of the value of the property that would be available to pay off the judgment creditors' claims. The *Norman* court also noted that the bankruptcy laws require that the value of the property is to be determined as of the date of filing, and that the value is "to be set at that amount which would [be] obtained from the most commercially reasonable disposition practicable under these circumstances.... [S]uch value would be the fair-market value." *Id.* at 566.

In *In re Sotter,* 28 B.R. 201 (Bankr.S.D. N.Y.1983), the bankrupt debtor had embezzled money from his employer bank through loans made to fictitious corporations. The bank obtained a $111,466.66 judgment against the debtor-in-bankruptcy, which would be considered an unsecured debt in bankruptcy. The court held that the $100,000 limitation for unsecured debts might not have been exceeded, however, because a portion of the bank's judgment should have been treated as a secured claim against the debtor's house in accordance with 11 U.S.C. § 506. The *Sotter* court used broad discretion in determining the amount of debt that could be considered "secured." The court noted that a debtor's interest in the house was a joint tenancy, and thus his interest could not be

regarded as valuable or marketable since the interest may be wiped out by the joint tenant's surviving the debtor. The court concluded that most of the judgment claim would be regarded as unsecured, though it did not assign a precise amount. *Id.* at 206. Again, this demonstrates the propriety of determining the actual value of collateral available to a supposedly secured creditor in deciding whether the jurisdictional $100,000 amount is exceeded. The *Sotter* court also stated that "[w]hen the genesis of the major obligations sought to be wiped out under a Chapter 13 plan is rooted in criminal conduct, the courts must be more circumspect in weighing the crucial issue of good faith." *Id.* at 205.

In *In re Krull,* 54 B.R. 375 (Bankr.D. Colo.1984), the creditor objected to a "secured" debt listed by the debtor, based on the valuelessness of the underlying collateral. Although the court found that the collateral did in fact have value, it reached this conclusion only after an analysis of the collateral's actual value. This procedure conforms with the above cases, demonstrating that a court should determine the actual secured value of a loan or other debt.

■ The court finds that in order to determine the true amount of unsecured debt, and consequently whether the appellee is eligible for Chapter 13, the bankruptcy court must consider whether the mortgages in the present case are secured by property of sufficient value. In particular, the court should determine whether the $16,-000 loan from the appellee's in-laws is in fact secured, or whether, prior to giving this mortgage, the appellee's previous mortgages were already collectively as great in dollar amount as the value of the real property securing the mortgages. The bankruptcy court should consider as secured only the amount of mortgaged debt that is actually backed up by real property, measured by the property's fair market value at the time of filing the petition in bankruptcy. This sort of determination may not be necessary in every bankruptcy case, but when analyzing whether the $100,000 Chapter 13 limit on unsecured debt was reached in good faith, it is vital. A sufficiently large amount of actually unsecured mortgage debt would not only disqualify the appellee from the safety of Chapter 13, but would also constitute possibly compelling evidence of bad faith.

■ Another matter that the bankruptcy must rectify is the status of the bank's note that was secured by $5,000 worth of Tri-County Feedlot Co. stock. The debtor included the $5,000 as "secured" in his petition. Although the bankruptcy court found that the appellee admitted the worthlessness of the stock, the court did not purport to alter appellee's listed amount of $93,540.64 in unsecured debt. When the jurisdictional amount of unsecured debt is at issue, the court should make *precise* findings on the matter. The court should also determine whether the debtor's listing of the debt as secured, when in fact the collateral is worthless, was an intentional act designed to alter the disposition of his petition. If so, it is but another indication of his bad faith in filing of the bankruptcy plan.

■ Finally, the court should give some weight in determining good faith to the fact that the debtor proposes no repayment of his unsecured debts, which he totalled at greater than $93,000, of which the bank has approximately $74,000. The Eighth Circuit addressed this factor in *In re Estus,* 695 F.2d 311, 316 (8th Cir.1982):

> As noted, repayment to unsecured creditors, although not a requirement for confirmation of every Chapter 13 plan, was one intended purpose of Chapter 13's enactment. Failure to provide substantial repayment is certainly evidence that a debtor is attempting to manipulate the statute rather than attempting honestly to repay his debts. But substantiality of proposed repayment is but one factor to be considered in deciding if a plan has been proposed in good faith; a court must make its determination based on all militating factors.

*Id.* at 316 (quoting *In re Deans,* 692 F.2d 968, 972 (4th Cir.1982)). Although some courts have held that a zero repayment plan is per se proposed in bad faith, *see* Annot., 73 A.L.R.Fed. 10 (1985), this court believes that it is but one more factor to be considered. Under *Flygare,* however, the weight given each factor can vary, and a zero repayment proposal should be given great weight because of its inherent unfairness to the unsecured creditor, especially one whose debt is unsecured because of the debtor's fraud.

## B.  ACCURACY OF THE PLAN

■ Appellant also challenges the accuracy of the plan's statement of the debts, expenses and percentage repayment of unsecured debt, and whether inaccuracies are an attempt to mislead the court. This was another factor listed in *Flygare.* Even if this court only considered appellee's conduct already mentioned above, it would support a holding that the bankruptcy court gave inadequate attention to this factor. In particular, the appellee's conduct in listing the $5,000 note as secured when in fact the collateral is worthless must be scrutinized. The bankruptcy court failed to consider this point. This court agrees with appellant that other omissions by the appellee make a calculation of his total unsecured debt impossible. Appellee's conduct *appears* to be a patent attempt to fraudulently invoke the bankruptcy laws in order to discharge otherwise nonavoidable debts. Appellee's failure to support his statement of debts with appropriate documentation, coupled with other inaccuracies in his proposed plan, lead this court to believe that the bankruptcy court should more closely analyze the appellee's plan. The bankruptcy court should ensure that this case involves less than $100,000 in verifiable, unsecured debt. The court should also make certain that *all* creditors are sufficiently apprised of their status under the bankruptcy plan. Suffice it to say that appellant raises legitimate objections to the accuracy of the plan. Although analysis of the specifics of the many detailed documents that the appellee filed pursuant to his Chapter 13 plan is beyond the scope of this opinion, the bankruptcy court should address these objections in full.

## III.  SUMMARY

■ This court agrees with the bankruptcy court's finding that a plan cannot be held to have been submitted in bad faith solely on the basis that it extinguishes a debt that would be non-dischargeable in Chapter 7 bankruptcy. Nor should a court *necessarily* find bad faith based on *any single* factor. However, possible indications of bad faith abound in the appellee's pre-filing conduct. The appellee must not be permitted to hide behind the rule that no single factor is determinative, when in fact his conduct demonstrates the presence of three or more factors tending to show his bad faith. This court believes that the bankruptcy court's finding that "the debtor's conversion of unsecured debt to secured debt on the eve of bankruptcy ... was a matter of good planning rather than bad faith" was made without a proper review of the facts. Although not explicitly listed as a factor in the *Flygare* case, a transparent attempt to rearrange the status of one's debt in order to discharge an otherwise non-dischargeable debt should be considered as an indication of the bad faith of the debtor in proposing his bankruptcy plan. If the appellee's in-laws received no collateral in fact, the loan must be considered unsecured, which would raise the total of unsecured debt beyond the $100,000 limit and thus eliminate the availability of a Chapter 13 bankruptcy.

The debtor's conduct in fraudulently securing a loan from the appellant and then seeking Chapter 13 protection, and in listing certain secured debts that are actually unsecured, are other factors that the court must consider in determining good faith. The inaccuracies and vagueness of appellee's plan lend further support to the absence of good faith. In addition, the totality of the above-described conduct demonstrates that the motivation and sincerity of the debtor in seeking Chapter 13 relief,

another of the *Flygare* factors, tend toward a finding that the debtor has acted in bad faith.

Although the court believes that appellee's conduct in filing his Chapter 13 bankruptcy plan appears to demonstrate indications of bad faith, in an abundance of caution, the court will remand the case to the bankruptcy court to allow reconsideration of the appellant's objections. Because of the absence of several key facts, this court cannot purport to determine that appellee actually lacked good faith in filing his bankruptcy plan. The court only holds that it was error not to inquire further into the matters discussed in this Memorandum and Order. For the purpose of clarity, the court will repeat the guidelines set forth in this opinion. On remand, the bankruptcy court should—

(1) broaden its scope of inquiry concerning the debtor's pre- and post-filing conduct in determining whether the plan was proposed in good faith;

(2) include among its additional findings of fact the three facts enumerated above;

(3) determine the fair market value of the appellee's real property as of the time of filing bankruptcy;

(4) determine the total dollar amount of debt owed by the appellee in the form of mortgages against the appellee's real property;

(5) determine the extent to which any debt purportedly secured by a mortgage is undercollateralized, and consider the amount of undercollateralization as unsecured debt;

(6) determine whether the $5,000 debt secured by Tri-County Feedlot, Inc. stock is actually secured or unsecured.

(7) make a factual determination of any other unsecured debt, including the total amount owed to the appellant, the Tri-County Feedlot, Inc., and any other unsecured debt that the parties prove to the court.

(8) add the amounts of (5), (6), and (7) to determine whether the total amount of unsecured debt exceeds the $100,000 limit of 11 U.S.C. § 109(e).

In accord with both the letter of the law and the policy set forth in *Flygare*, the bankruptcy court should consider the following in determining whether appellee's plan was filed in good faith:

(1) The appellant's unsecured debt, which is dischargeable in Chapter 13 bankruptcy, is non-dischargeable in Chapter 7 bankruptcy, based on the dishonesty and fraud of the debtor in securing the debt;

(2) The appellee's loan from his in-laws on the eve of bankruptcy had the immediate effect of bringing the debtor within the limits of Chapter 13, which could enable him to avoid nearly $100,000 worth of fraudulently incurred debt;

(3) Whether the appellee's listing of $5,000 worth of admittedly valueless stock as securing a note was an attempt to further reduce the amount of unsecured debt, which would be a strong indication of bad faith;

(4) The appellee's proposed plan calls for no payment to unsecured creditors. In the bank's case, something on the order of $74,000 will be wiped out; and

(5) Whether the appellee purposefully inserted the contradictory and confusing sets of figures in his proposed plan, which has made it nearly impossible for creditors or the court to adequately determine the total debt, total assets, payback amounts, etc.

In light of the policy considerations discussed in this opinion and the failure of the bankruptcy court to adequately consider the conduct of the appellee, this court finds that the order of confirmation must be vacated and the case remanded for reconsideration of the issue of good faith.

IT IS BY THE COURT THEREFORE ORDERED that confirmation of appellee's Chapter 13 bankruptcy plan be vacated and the matter remanded to the bankruptcy court for reconsideration consistent with this Memorandum and Order.